# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| BRIAN WALDEN, JR., | : | Hon. Joseph H. Rodriguez |
| Plaintiff, | : | Civil Action No.  13-7468 |
| v. | : | |
| VOORHEES TOWNSHIP, | : | OPINION |
| ANTHONY DEL PALAZZO, individually and in his official capacity as a police officer for the Township of Voorhees, | : | |
| KEVIN MACAULEY, individually and in his official capacity as a police officer for the Township of Voorhees, | : | |
| THOMAS MACAULEY, individually and in his official capacity as a police officer for the Township of Voorhees, | : | |
| VOORHEES TOWNSHIP POLICE DEPARTMENT, JOHN DOES 1-10, | : | |
| Defendants. | : | |

This matter is before the Court on motion of Defendants for summary judgment pursuant to Federal Rule of Civil Procedure 56 [Doc. 16]. Plaintiff Brian Walden, Jr. has opposed the motion.  Oral argument was heard on November 18, 2015, and the record of that proceeding is incorporated here.  For the reasons set forth during argument and below, summary judgment is granted in part and denied in part.

## Jurisdiction

This case is a civil action over which the district court has original jurisdiction based on a question "arising under the Constitution, laws, or treaties of the United States."  See 28 U.S.C. § 1331.  Plaintiff asserts a violation of his civil rights pursuant to 42 U.S.C. § 1983.  With respect to Plaintiff's state law claims, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

## Background

This is a civil rights case stemming from a December 17, 2011 traffic stop and subsequent vehicle search, in Voorhees, New Jersey, and an alleged weapons pat-down and in-cell search.  Defendant Voorhees Township Police Officer Anthony Del Palazzo pulled over Plaintiff's vehicle, requested his credentials, and ordered Plaintiff out of the car.  He asked Plaintiff for consent to search the vehicle, which Plaintiff eventually granted when Del Palazzo allegedly threatened to bring drug-sniffing dogs to the scene.  Defendants Kevin Macauley and Thomas Macauley, also Voorhees Township Police Officers, joined Plaintiff and Del Palazzo and participated in the search of Plaintiff's car.  No contraband was found.

Defendants then allegedly told Plaintiff that they smelled "burnt marijuana" on his clothes, and searched Plaintiff.  Plaintiff contends that a

strip search was conducted on the side of the road.  He also states that Defendants threw him to the ground and punched him in the face multiple times.  Next, Plaintiff was handcuffed and transported in a police car to the Voorhees Township Police Station, where he alleges the three Defendant officers conducted a second strip search.  Plaintiff was charged with obstruction of a law enforcement officer and resisting arrest, but states that the charges were later dismissed.

Plaintiff alleges that the Defendants acted in concert to deprive him of his rights.  (Compl. ¶8.)  He argues that the use of excessive force on him "is an example of the Defendants' pattern, practice, and custom of subjecting non-resisting and non-threatening citizens . . . to unreasonable search and/or seizure."  (Id. ¶26.)  Plaintiff also contends that Voorhees Township has "failed to adequately discipline, train, supervise, or otherwise direct police officers . . . in the proper use of force."  (Id. ¶28.)  He states a claim for violation of his rights to be free from excessive force and illegal search and seizure in violation of the federal constitution and the New Jersey State Constitution and Civil Rights Act, N.J. Stat. Ann. § 10:6-2(c).

## **Summary Judgment Standard**

A court will grant a motion for summary judgment if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law.  Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56 (c).  Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56 (c).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994).  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Andersen, 477 U.S. at 256-57.  Indeed, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 322.

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249.  Credibility determinations are the province of the finder of fact.  Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## Discussion

### 42 U.S.C. § 1983

Plaintiff's Constitutional claims are governed by Title 42 U.S.C. § 1983, which provides a civil remedy against any person who, under color of state law, deprives another of rights protected by the United States Constitution.  See Collins v. City of Harker Heights, 503 U.S. 115, 120 (1992). Any analysis of 42 U.S.C. § 1983 should begin with the language of the statute:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

See 42 U.S.C. § 1983.

As the above language makes clear, Section 1983 is a remedial statute designed to redress deprivations of rights secured by the Constitution and its subordinate federal laws.  See Baker v. McCollan, 443 U.S. 137, 145 n.3 (1979).  By its own words, therefore, Section 1983 "does not . . . create substantive rights."  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Baker, 443 U.S. at 145, n.3).

To state a cognizable claim under Section 1983, a plaintiff must allege a "deprivation of a constitutional right and that the constitutional deprivation was caused by a person acting under the color of state law." Phillips v. County of Allegheny, 515 F.3d 224, 235 (3d Cir. 2008) (citing Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996)).  Thus, a plaintiff must demonstrate two essential elements to maintain a claim under § 1983: (1) that the plaintiff was deprived of a "right or privileges secured by the Constitution or the laws of the United States" and (2) that plaintiff was deprived of his rights by a person acting under the color of state law. Williams v. Borough of West Chester, Pa., 891 F.2d 458, 464 (3d Cir. 1989).

A similar analysis may be made regarding any claim under the New Jersey Civil Rights Act.  See Armstrong v. Sherman, No. 09-716 (AET), 2010 WL 2483911, *5 (D.N.J. Jun. 4, 2010) ("[T]he language of the New Jersey Civil Rights Act, like the language of 42 U.S.C. § 1983, appears to grant a cause of action only to those persons whose rights have been personally violated.").

## Municipal Liability

A municipality is not liable under 42 U.S.C. § 1983 on a *respondeat superior* theory.  Monell v. Dept. Soc. Servs. of New York, 436 U.S. 658, 691 (1978).  However, a government entity may be liable for its agent's actions

upon a demonstration that a policy or custom of the municipality caused, or was a "moving force" behind, the alleged violation of Plaintiff's rights. Kentucky v. Graham, 473 U.S. 159, 166 (1985) (quoting Polk County v. Dodson, 454 U.S. 312, 326 (1981)); Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996).[1]  Thus, in order to prevail against the government entity, "[a] plaintiff must identify the challenged policy, attribute it to the city itself, and show a causal link between execution of the policy and the injury suffered." Losch v. Parkesburg, 736 F.2d 903, 910 (3d Cir. 1984).  Further, to impose municipal liability pursuant to a custom, a plaintiff must show that the municipality acted with "deliberate indifference" to its known or obvious consequences.  Canton v. Harris, 489 U.S. 378, 388 (1989); Board of County Comm'rs of Bryan County, Okl. v. Brown, 520 U.S. at 397, 398 (1997).  See also Berg v. County of Allegheny, 219 F.3d 261, 277 (3d Cir. 2000) (this can be shown if it is obvious that a custom would lead to

---

[1] Policy is made when a decisionmaker with final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict. Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir. 1990).  A course of conduct or practice is considered custom when, though not authorized by law, such practices are "so permanent and well-settled as to virtually constitute law."  Id.  Custom can also be established through evidence of knowledge and acquiescence.  Groark v. Timek, No. 12- 1984, 2013 WL 6199187, at *17 (D.N.J. Nov. 27, 2013).

constitutional violations).  "A showing of simple or even heightened negligence will not suffice."  <u>Brown</u>, 520 U.S. at 407.

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983."  <u>Connick v. Thompson</u>, 563 U.S. 51, ---, 131 S. Ct. 1350, 1359 (2011).  The failure to train "must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'"  <u>Connick</u>, 131 S. Ct. at 1359 (quoting <u>Canton</u>, 489 U.S. at 388).  Deliberate indifference requires that the defendant was on notice that, absent additional specific training, it was highly predictable that the individual offices would use excessive force; this can be demonstrated through a pattern of similar violations that would establish that the "policy of inaction" was "the functional equivalent of a decision [by the municipality] itself to violate the Constitution."  <u>Connick</u>, 131 S. Ct. at 1360.

A plaintiff cannot seek to hold a municipality liable for damages where the officer has inflicted no constitutional harm.  <u>Acumed LLC v. Advanced Surgical Servs., Inc.</u>, 561 F.3d 199, 217 n.12 (3d Cir. 2009) (citing <u>City of Los Angeles v. Heller</u>, 475 U.S. 796, 799 (1986)).  Even if the officers' actions were unconstitutional, a single incident likely would not

demonstrate a need for training so obvious as to give rise to a failure to train claim under § 1983.  See Connick, 131 S. Ct. at 1360 (stating that "single-incident liability" applies only in "narrow range of circumstances" where "unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations" (quotations and citations omitted)).

Further, the United States Supreme Court has held that "neither a State nor its officials acting under their official capacities are 'persons' under § 1983." Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989).  As such, an employee of the state named as a defendant in a civil rights action may be held liable only if that person has personal involvement in the alleged wrongs and is sued in their personal capacity. See Hafer v. Melo, 502 U.S. 21, 31 (1991) ("state officials, sued in their individual capacities, are 'persons' within the meaning of § 1983").

Police departments cannot be sued in conjunction with municipalities because police departments are administrative arms of municipalities, not separate entities.  Adams v. City of Camden, 461 F. Supp. 2d 263, 266 (D.N.J. 2006); Bonenberger v. Plymouth Twp., 132 F.3d 20, 25 (3d Cir. 1997) (holding police department and municipality same for § 1983); N.J.

Stat. Ann. § 40A:14-118 (municipal police department is "an executive and enforcement function of municipal government").

## Qualified Immunity

The doctrine of qualified immunity provides that "government officials performing discretionary functions . . . are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Thus, government officials are immune from suit in their individual capacities unless, "taken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right" and "the right was clearly established" at the time of the objectionable conduct. Saucier v. Katz, 533 U.S. 194, 201 (2001). Courts may exercise discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

This doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when

they perform their duties reasonably" and it "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact. Id. (internal quotation omitted). Properly applied, qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2085 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Saucier v. Katz, 533 U.S. 194, 202 (2001) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). That is, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Couden v. Duffy, 446 F.3d 483, 492 (2006). "If the officer's mistake as to what the law requires is reasonable," the officer is entitled to qualified immunity. Couden, 446 F.3d at 492 (internal citations omitted). Further, "[i]f officers of reasonable competence could disagree on th[e] issue, immunity should be recognized." Malley v. Briggs, 475 U.S. 335, 341 (1986). See also Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (The general touchstone is whether the conduct of

the official was reasonable at the time it occurred.).  Finally, because

qualified immunity is an affirmative defense, the burden of proving its

applicability rests with the defendant.  See Beers-Capital v. Whetzel, 256

F.3d 120, 142, n.15 (3d Cir. 2001).

## Fourth Amendment

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses,
> papers and effects, against unreasonable searches and seizures,
> shall not be violated, and no Warrants shall issue, but upon
> probable cause, supported by Oath or affirmation, and
> particularly describing the place to be searched, and persons or
> things to be seized.

A Fourth Amendment excessive force claim calls for an evaluation of

whether police officers' actions are objectively reasonable in light of the

facts and circumstances confronting him.  Graham v. Conner, 490 U.S. 386,

397 (1989).  While the question of reasonableness is objective, the court

may consider the severity of the crime at issue, whether the suspect poses

an immediate threat to the safety of the officers or others, and whether the

suspect is actively resisting arrest or attempting to evade arrest by flight.

Id.  In a claim for excessive force, "the central question is 'whether force

was applied in a good faith effort to maintain or restore discipline, or

maliciously and sadistically to cause harm.'" Brooks v. Kyler, 204 F.3d 102,

106 (3d Cir. 2000) (quoting Hudson v. McMillian, 503 U.S. 1, 7 (1992)).

Furthermore, appropriate attention should be given "to the circumstances of the police action, which are often 'tense, uncertain, and rapidly evolving.'" <u>Groman v. Township of Manalapan</u>, 47 F.3d 628, 634 (3d Cir. 1995) (quoting <u>Graham</u>, 490 U.S. at 396).  <u>See also</u> <u>Graham</u>, 490 U.S. at 396 ("Not every push or shove, even if it may later seem unnecessary," violates the constitution.).

## <u>Analysis</u>

Here, Plaintiff has failed to prove the existence of any official policies or customs that may have caused a constitutional violation in this case. <u>See, e.g.</u>, <u>McTernan v. City of York, Pa.</u>, 564 F.3d 636 (3d Cir. 2009) ("[A plaintiff] must identify a custom or policy, and specify what exactly that custom or policy was.").   Although he alleged that the use of excessive force on him was "an example of Defendants' pattern, practice and custom of subjecting non-resisting and non-threatening citizens . . . to excessive force and unreasonable search and/or seizure," the record does not support a finding of any such official policy or custom.  Similarly, the record does not support the allegation that the municipality's deliberate indifference or failure to train caused and encouraged the unlawful conduct of its officers. As such, summary judgment is granted as to Voorhees Township.  In addition, because a police department cannot be sued in conjunction with

the municipality it serves since it is not an entity separate from the municipality, but rather is merely an arm of the municipality, the Voorhees Township Police Department is not amenable to suit on its own, and summary judgment will be granted as to that entity.

To the extent that Plaintiff has sued the Defendant police officers in their official capacities, summary judgment must be granted because these are really claims against the police department and, in turn, the municipality.  See Hafer, 502 U.S. at 25 ("official capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent").

Accordingly, the Court is left with the claims against the officers in their individual capacities.  As stated above, the Court must evaluate the substance of Plaintiff's excessive force claims stemming from his traffic stop and subsequent charges to determine whether a reasonable jury could conclude that the officers' actions were objectively unreasonable under the circumstances.  This determination requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, whether he is actively resisting arrest or attempting to evade arrest by flight, the possibility that the persons subject to the

police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.  Graham, 490 U.S. at 396; Sharrar v. Felsing, 128 F.3d 810, 821–22 (3d Cir. 1997).  Because reasonableness depends on a careful analysis of the facts and circumstances of the use of force, objective reasonableness often remains a question for the jury; however, "defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances."  Kopec v. Tate, 361 F.3d 772, 777 (3d Cir. 2004).  Discovery has revealed the following about the incident at issue.

On the night of December 17, 2011, Plaintiff dropped off his sister at her apartment near the Echelon Mall and then drove onto Evesham Road where he was pulled over by a Voorhees Township police car whose "dome lights" were illuminated.  (Walden Dep., pp. 80-83, 87.)  Plaintiff pulled his car over to the side of the road and was approached by the Defendant Del Palazzo who told plaintiff that his license plate bulb was out.  (Walden Dep., pp. 87-88, 90; Del Palazzo Dep., pp. 29, 30, 32-33.)  Also present in the police car with Del Palazzo was Defendant Kevin Macauley, a part-time

officer-in-training.  (Del Palazzo Dep., pp. 27, 47-48.)  Kevin Macauley was

still in field training and had no involvement in deciding to stop the

Plaintiff's vehicle or in deciding to search or charge the Plaintiff thereafter.

(Thomas Macauley Dep., pp. 21-23; Kevin Macauley Dep., pp. 10, 30, 32.)

After approaching Plaintiff's car, Del Palazzo asked Plaintiff for his

license and registration, which Plaintiff provided.  (Walden Dep., pp. 88,

90; Del Palazzo Dep., p. 35.)   While Del Palazzo was speaking with the

plaintiff, he states that he detected the odor of raw marijuana coming from

Plaintiff's car.  (Del Palazzo Dep., p. 35.)  Del Palazzo also testified that

Plaintiff was "not looking in [his] direction while he was speaking and

continually was turning around and looking out the rear window," which

Defendant found "alarming" and "suspicious."  (Del Palazzo Dep., pp. 35-

36.)  Del Palazzo also testified that he saw a "blunt wrapper laying on the

passenger-side front seat."  (Del Palazzo Dep., p. 37.)  Del Palazzo walked

back to his patrol car and ran Plaintiff's information, which indicated that

Plaintiff had been arrested and jailed in August 2011 for possession of a

controlled dangerous substance.  (Walden Dep., pp. 88-91; Del Palazzo

Dep., pp. 38, 40.)  Del Palazzo returned to Plaintiff's car and asked Plaintiff

to exit the vehicle and stand near the back of the car, which Plaintiff did.

(Walden Dep., pp. 93-95; Del Palazzo Dep., pp. 43, 45-46.)  At that point,

Kevin Macauley was out of the police car observing the scene in his protective "cover officer" role.  (Walden Dep., pp. 97-102; Del Palazzo Dep., p. 48; Kevin Macauley Dep., p. 13.)  Del Palazzo began speaking to Plaintiff outside the cars at which time he testified Plaintiff "was looking away" and Del Palazzo "could still detect the odor of raw marijuana."  (Del Palazzo Dep., p. 51.)

At that point, Defendant Thomas Macauley - brother of Defendant Kevin Macauley – arrived at the scene for assistance.  (Del Palazzo Dep., pp. 52, 55.)  Thomas Macauley heard the call for the traffic stop over his radio and went to the scene to give "assistance" because the officers "like[d] to back each other up at nighttime on motor vehicle stops."  (Del Palazzo Dep., pp. 17, 19.)

Del Palazzo asked Plaintiff for consent to search his car; eventually Plaintiff consented by signing a permission-to-search form. (Walden Dep., pp. 102-107; Del Palazzo Dep., pp. 56-61.)  Del Palazzo and Thomas Macauley searched Plaintiff's car.  (Walden Dep., p. 109; Del Palazzo Dep., p. 62; Thomas Macauley Dep., p. 30.)  At the time, Kevin Macauley was standing on the sidewalk next to Plaintiff. (Walden Dep., pp. 110-111; Del Palazzo Dep., p. 65.)

During the vehicle search, Thomas Macauley told Del Palazzo that he observed the Plaintiff "placing his hands in the front portion of his waist" and that he "could detect a strong odor of raw marijuana emanating from him." (Del Palazzo Dep., pp. 65-66, 68; Thomas Macauley Dep., pp. 31-32.) Del Palazzo described this conduct as "alarming" from a safety perspective because he had, in the course of patrolling the area, found that people were tucking handguns into their waistbands. (Del Palazzo Dep., pp. 68-69.) Del Palazzo and Thomas Macauley approached Plaintiff and told him to remove his hands from his waistband; Plaintiff complied. (Del Palazzo Dep., p. 68, 71; Thomas Macauley Dep., p. 34.) Thomas Macauley again remarked that he "could detect a strong odor of raw marijuana emanating from" Plaintiff. (Del Palazzo Dep., p. 72; Thomas Macauley Dep., p. 34.) Thomas Macauley spoke to Plaintiff, who continued placing his hands inside the front of his pants; Thomas Macauley told Plaintiff for a second time to remove his hands from his waist area, which Plaintiff did. (Del Palazzo Dep., pp. 72-74; Thomas Macauley Dep., p. 34.) Thomas Macauley testified that at the time, Plaintiff "bladed his body from" the officer. (Thomas Macauley Dep., p. 34.) He described "blading": "Bladed away, fighter's stance or if you were concealing a weapon, you would turn so that that area was away from whoever you were confronting or speaking with . . .

19

you could also describe the blade[] as a combative stance." (Thomas Macauley Dep., pp. 34-35).

While Thomas Macauley had been speaking with the Plaintiff, Del Palazzo had assumed a "cover role." (Del Palazzo Dep., p. 72.)  Thomas Macauley asked the Plaintiff if he was concealing any weapons and Plaintiff did not respond; Thomas Macauley asked the plaintiff a second time about concealed weapons and the Plaintiff said he did not have any.  (Del Palazzo Dep., p. 74; Thomas Macauley Dep., p. 34.)  Thomas Macauley testified that he told Plaintiff that he was going to perform a protective pat-down for weapons. (Del Palazzo Dep., p. 74; Thomas Macauley Dep., p. 34.)  Plaintiff denies being told that there would be a protective pat-down for weapons. (Walden Dep., pp. 116-17.)  Plaintiff was wearing several articles of clothing including, boxer shorts, long thermal underwear, jeans over the thermals, a sweater, "maybe a t-shirt under," "[m]aybe a white tank top" under the t-shirt and a Carhart jacket. (Walden Dep., pp. 120-121.)

Thomas Macauley testified that when he reached Plaintiff's waist area during the "pat down," Plaintiff "continued to turn away from me" "when I had come towards his waistline towards the front area of his pants" and "wouldn't let me pat down that portion of his body." (Thomas Macauley Dep., p. 36.)  Plaintiff testified that after the officer got to his pants area,

"I'm fidgeting . . . it was movement, like I felt violated movement. . . . It was very uncomfortable.  It was an uncomfortable movement.  (Walden Dep., pp. 114-117.)  He also contends that the Defendants pulled down his pants on the side of the road.  (Walden Dep., p. 122-23.)

Next, Thomas Macauley took the Plaintiff's left arm while Defendant Kevin Macauley took the Plaintiff's right arm so he could not reach his front waist band while Del Palazzo began to pat down the Plaintiff's front waist area. (Del Palazzo Dep., pp. 76, 78; Thomas Macauley Dep., pp. 38-39.) The Defendants testified that they believed Plaintiff was trying to conceal a weapon.  (Del Palazzo Dep., pp. 77, 79; Thomas Macauley Dep., pp. 38-39; Kevin Macauley Dep., pp. 25-26.)  Plaintiff pulled away to prevent Del Palazzo from reaching his front waist area.  (Del Palazzo Dep., pp. 76-77.)

At this point, Defendants took Plaintiff to the ground.  (Del Palazzo Dep., pp. 79-80; Thomas Macauley Dep., pp. 42-43, 53-54; Kevin Macauley Dep., at pp. 27-28.)  Plaintiff alternately describes his physical contact with the officers initially as "dunking"/"slamming," then not as slamming, but maybe just "twisting" and throwing him to the ground.  (Walden Dep., pp. 117-118.)  His chest was on the ground and his face made contact with the sidewalk.  (Walden Dep., pp. 119-120.)  Plaintiff testified that while he was on the ground, he was punched on the right side of his face. (Walden Dep.,

pp. 123-124.)  Plaintiff was handcuffed and the pat-down resumed "with

negative results."  (Del Palazzo Dep., pp. 79, 81, 83-86; Thomas Macauley

Dep., p. 44.)  Nonetheless, Plaintiff was put in a police car, and driven to

the Voorhees Township police station by Del Palazzo and Kevin Macauley.

(Walden Dep., pp. 124, 130, 132; Del Palazzo Dep., p. 85; Kevin Macauley

Dep., p. 29.)

     In his Answers to Interrogatories, Plaintiff describes the force used at

the traffic stop:

> After engaging in approximately a twenty (20)-minute search of
> Plaintiff's motor vehicle, Defendants Officers advised that they
> had not found any drugs in the car so "you [Plaintiff] must have
> the drugs."  One Defendant Officer grabbed Plaintiff by the right
> arm the other Defendant Officer grabbed Plaintiff by the left
> arm and they began frisking Plaintiff and shined a flashlight
> down Plaintiff's pants in his crotch area.  Plaintiff began to
> squirm and fidget.  Plaintiff was then immediately slammed to
> the ground by all Defendants Officers he was punched twice in
> the face and the Defendants Officers held Plaintiff down on the
> ground, handcuffed him and put him in the police car.

(Pl. Answers to Interrogs., No. 1.)

     "Plaintiff was then transported to the Voorhees Police Station

wherein  . . . he was led into a cell-type area [and] advised . . . to strip

off his clothes one article of clothing at a time until Plaintiff was

standing before three police Officers Defendants in nothing [but] his

underwear."  (Id.)  This search also yielded "negative results."  (Del

Palazzo Dep., pp. 86-87.)  Plaintiff has no recollection about being

told about the search in the cell and why it was taking place.  (Walden

Dep., p. 134.)  Plaintiff put his clothes back on and was escorted to a

"main room" where he was issued summonses for resisting arrest and

obstructing a law enforcement officer.[2]  (Walden Dep., pp. 136-137;

Del Palazzo Dep., p. 87.)  He was then driven back to his car.

(Walden Dep., p. 140.)

Turning first to whether a jury could find that Plaintiff was deprived

of a constitutional right, Defendants argue that the officers suspected

Plaintiff to be in possession of a weapon.  The problem with Defendants'

analysis is that it fails to account for the fact that at the time they allegedly

took Plaintiff to the ground and struck him, Plaintiff had been out of his

vehicle and standing by the passenger side of his car with an officer for

approximately twenty minutes while his car was searched.  Further, the

record indicates that while Plaintiff was handcuffed, he was thoroughly

searched, and no weapon was recovered.  Nonetheless, after driving

Plaintiff to the police station, the Defendants searched him again, allegedly

---

[2] Even if Plaintiff pled guilty to resisting arrest, it remains possible that the officers responded to his physical resistance with excessive force, and executed a lawful arrest in an unlawful manner.  Garrison v. Porch, 376 F. App'x 274, 277–78 (3d Cir. 2010); Lora–Pena v. F.B.I., 529 F.3d 503, 506 (3d Cir. 2008); Nelson v. Jashurek, 109 F.3d 142, 146 (3d Cir. 1997).

looking for a weapon, to the extent that Plaintiff was in his underwear in a cell for a broken license plate lamp.  The Court cannot find, on the basis of this record, that no reasonable jury could find that the individual Defendant did not violate the Fourth Amendment.  Indeed, the record does not depict the sort of tense, uncertain events that Defendants contend transpired.  Plaintiff complied with every request made.  Accordingly, a reasonable factfinder could conclude that Defendants used excessive force against Plaintiff thereby violating his Fourth Amendment rights.  Plaintiff's excessive force claim therefore survives the first step in the qualified immunity analysis.

Having determined that sufficient evidence exists in connection with the Defendants taking Plaintiff to the ground and striking him, followed by the search at the police station, such that Defendants have violated Plaintiff's Fourth Amendment right to be free from unlawful seizure, the Court turns to whether the right that was violated was clearly established. To answer that question, a court must determine whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted.  See Curley v. Klem, 499 F.3d 199, 207 (3d Cir. 2007) ("The question at this second [Saucier] step is whether the right that was violated was clearly established, or, in other words, 'whether it would be clear to a

reasonable officer that his conduct was unlawful in the situation confronted.'") (quoting <u>Saucier</u>, 533 U.S. at 202). "Officers who make reasonable mistakes as to what the law requires are entitled to qualified immunity." <u>Green v. New Jersey State Police</u>, 246 F. App'x 158, 162 (3d Cir. 2007). Thus, the right at issue is "clearly established" only if it would be unreasonable for officers to believe that Defendants' actions would not constitute excessive force. <u>See</u> <u>id.</u> at 163. However, a police officer effecting an arrest may only use the force that is necessary: a "plaintiff may bring a claim pursuant to § 1983 where police use more force than is necessary to arrest him." <u>Thomas v. City of Erie</u>, 236 F. App'x 772, 776 (3d Cir. 2007).

Here, there is evidence in the record that Plaintiff was punched while chest-down on the ground. In such circumstances, the Court finds that it would be unreasonable for officers to believe that Defendants' actions in striking Plaintiff would not constitute excessive force. There was no urgency under the circumstances that could justify the use of force that Defendants exercised. In addition, it would be unreasonable for officers to believe the extent of the search at the jail was justified. Accordingly, Defendants are not entitled to the defense of qualified immunity in connection with Plaintiff's claim that Defendants used excessive force and conducted an illegal search and Defendants' motion for summary judgment

is denied as to those claims.  A jury will have to decide the facts based upon its assessment of the evidence.

Regarding Defendants' argument that Kevin Macauley should be granted summary judgment because his role was minimal, a § 1983 claim for the failure to stop the use of excessive force rises to the level of a constitutional violation if excessive force was used and such defendants had a reasonable opportunity to prevent the use of excessive force.  See, e.g., Smith v. Mensinger, 293 F.3d 641, 650 (3d Cir. 2002).  The credibility questions on this issue will also be put to a jury.

Finally, the defense vigorously argues that this matter cannot proceed because Plaintiff has not secured an expert to rebut the expert report Defendants offer.  As discussed at length during oral argument, however, that is not the case.

## <u>Conclusion</u>

For the reasons set forth here, summary judgment is granted in part and denied in part.  An appropriate Order will be filed.


Dated: November 24, 2015                     /s/ Joseph H. Rodriguez
                                        JOSEPH H. RODRIGUEZ
                                        U.S.D.J.